# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| Steve Urvan and TVP Investments, LLC )<br><br>  Plaintiffs, )<br><br> )<br> )<br>v. )<br> )<br>TVP Ventures, LLC; Triton Value )<br>Partners Opportunity Fund I, L.P.; Triton )<br>Opportunity Fund Manager, LLC; TVP )<br>Ventures Fund Manager, LLC; TVP )<br>Ventures I, L.P.; Triton Holdings )<br>International, Inc.; Triton Accelerator )<br>Fund, LLC; Triton Opportunity Pledge )<br>Fund; and Triton Business Development )<br>Services, Inc. n/k/a Triton Value )<br>Partners, LLC )<br> ) | Case No. _____ |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS, GEORGIA SECURITIES LAWS, GEORGIA COMMON LAW AND AN ACCOUNTING

COMES NOW STEVE URVAN AND TVP INVESTMENTS, LLC,

Plaintiffs in the above-styled action, by and through undersigned counsel, and

hereby files this Complaint for Damages and an Accounting, respectfully showing

this Honorable Court the following:

## INTRODUCTION

1.

This Action arises from the relationship between trusted investment advisors and a successful business entrepreneur, Steve Urvan, which began in 2006. Although there was a fallout in the relationship between Plaintiffs and Defendants at the end of 2013, Defendants' fiduciary responsibilities to Plaintiffs pursuant to the federal and Georgia securities laws, as well as Georgia common law, never ended. Defendants have repeatedly and continuously failed to fulfill their fiduciary obligations and have actively sought to conceal their wrongdoing.

2.

The Defendants fancy themselves as a "private equity firm and business consulting firm," and the press has described Defendants as a "merchant bank," but under the laws of the United States, Defendants were functioning as unregistered investment advisors pursuant to the Investment Advisors Act of 1940; unregistered broker-dealers pursuant to the Securities Exchange Act of 1934; and unregistered investment companies pursuant to the Investment Company Act of 1940.

3.

More important than Defendants' complete failure to comply with federal and state law, Defendants have breached the fiduciary duties of care, loyalty and utmost

good faith that trusted financial advisors owe to their clients under applicable federal and state laws. Defendants have improperly converted investments that were made by Plaintiffs for their person use. Defendants have failed to keep their clients, the Plaintiffs, fully informed and apprised of the status of their investments. Defendants have acted with undisclosed and unaddressed conflicts of interest which resulted in detrimental harm to Plaintiffs. Furthermore, Defendants have refused all efforts to obtain an accounting from them regarding the status of the various investments made by Plaintiffs.

**THE PARTIES**

4.

Plaintiff, Steve Urvan (hereinafter "Urvan" or "Mr. Urvan"), is an individual, natural person and resident of the state of Florida with substantial business holdings in the state of Georgia. Mr. Urvan resides in Palm Beach County, Florida. Mr. Urvan has standing to bring the attendant claims against the named Defendants.

5.

Plaintiff, TVP Investments, LLC (hereinafter "TVP Investments") is a Delaware limited liability company with its principal place of business located in Cobb County, Georgia. TVP Investments is properly registered and licensed to do

business in this State, is subject to the jurisdiction of this Court, and otherwise has standing to bring the attendant claims against the named Defendants.

6.

Defendant TVP Ventures, LLC (hereinafter "Ventures") is a limited liability company with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688.  Ventures was formed on or about January 11, 2008, and was originally named "Triton Financial Advisors, LLC." The name was legally changed to "TVP Capital Markets, LLC" within a year of its formation and the name was changed again to "TVP Ventures, LLC" on or about March 5, 2010. Ventures may be served with a second original of this Complaint and Summons through its registered agent, Donald B. Gasgarth, at its principal office address, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

7.

Defendant Triton Value Partners Opportunity Fund I, L.P. (hereinafter "Opportunity Fund") is a limited partnership with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688.  Opportunity Fund was formed on or about January 17, 2008, and its general partner is listed as Opportunity Fund Manager, LLC with the same business address as the Opportunity Fund.  Opportunity Fund may be served with a second original of this

Complaint and Summons through its registered agent, Donald B. Gasgarth, at its principal office address, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

8.

Defendant Triton Opportunity Fund Manager, LLC (hereinafter "Opportunity Fund Manager") is a limited liability company with a principal office address of Wilton Center, Roswell, Georgia 30075 in either Suite 470 or Suite 270. Opportunity Fund Manager, LLC was administratively dissolved on or about September 5, 2012, but continues to be listed as the general partner of the Opportunity Fund, as of 2019. Furthermore, based on information and belief, Opportunity Fund Manager has continued conducting business from 2012 to the present. Opportunity Fund Manager may be served with a second original of this Complaint and Summons through its registered agent, Donald B. Gasgarth, at 3020 Bellingrath Boulevard, Roswell, Georgia 30076, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

9.

Defendant TVP Ventures Fund Manager, LLC (hereinafter "Ventures Fund Manager") is a limited liability company with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688. Ventures Fund

Manager was formed on or about March 5, 2010, and purportedly was administratively dissolved on or about August 26, 2019. Based on information and belief, Ventures Fund Manager continues to conduct business to the present day. Ventures Fund Manager may be served with a second original of this Complaint and Summons through its registered agent, Donald B. Gasgarth, at its principal office address, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

10.

Defendant TVP Ventures I, L.P. (hereinafter "Ventures I") is a limited partnership with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688. Ventures I was formed on or about March 5, 2010, and its general partner is listed as Jeffrey K. Zwitter with the same business address as Ventures I. Ventures I may be served with a second original of this Complaint and Summons through its registered agent, Jeffrey K. Zwitter at its principal office address, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

11.

Defendant Triton Holdings International, Corporation (hereinafter "Triton International") is a Delaware corporation with its principal place of business at

3020 Bellingrath Boulevard, Roswell, Georgia 30076.  Triton International may be served with a second original of this Complaint and Summons through its registered agent, Colby Attorney Service Co., Inc., 850 New Burton Road, Suite 201, Dover, Delaware 19904, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

12.

Defendant Triton Accelerator Fund, LLC (hereinafter "Accelerator Fund") is a limited liability company with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688.  Plaintiffs are unaware as to when Accelerator Fund was formed or what purpose it serves, but based on information and belief, Accelerator Fund continues to conduct business to the present day, is intimately involved with the other Defendants, and/or is the alter ego of the other Defendants.  Accelerator Fund may be served with a second original of this Complaint and Summons through its members/managers, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

13.

Defendant Triton Opportunity Pledge Fund (hereinafter "Pledge Fund") is a limited liability company with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688.  Plaintiffs are unaware of when

Pledge Fund was formed or what purpose it serves, but based on information and belief, Pledge Fund continues to conduct business to the present day, is intimately involved with the other Defendants, and/or is the alter ego of the other Defendants. Pledge Fund may be served with a second original of this Complaint and Summons through its members, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

14.

Defendant Triton Business Development Services, Inc. n/k/a Triton Value Partners, LLC (hereinafter "Triton Partners") is a limited liability company with a principal office address of 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30009-8688.    Triton Partners was originally formed as a domestic profit corporation named Triton Business Development Services, Inc. on or about February 10, 2006, but was converted to a limited liability corporation and changed its name to Triton Value Partners, LLC on or about January 18, 2008. Triton Partners may be served with a second original of this Complaint and Summons through its registered agent, Donald B. Gasgarth, at its principal office address, or by any other means proper pursuant to the Federal Rules of Civil Procedure.

15.

The nine corporate and partnership entities described in Paragraphs 6 through 14 above are legally registered as separate corporate or partnership entities and purport to have their own corporate or partnership formalities, respectively. In reality, however, the defendant corporations are operating as a single business and are effectively alter egos of each other. These corporate and partnership defendants have a common business address, common principals and based on information and belief, are operated as single, cohesive business. For ease of reference, when referring to all the corporate and partnership entities, or when Plaintiffs lack specific information regarding which corporate or partnership entity was purportedly undertaking a specific action, the Complaint shall refer to all nine corporate and partnership entities as the "Triton Entities."

16.

Due to the proclivity of the Triton Entities and their principals to create new, but interrelated corporate and/or partnership entities to obfuscate and obscure their business activities, Plaintiffs may not be aware of all of the corporate and/or partnership entities which should be included as Triton Entities and named as Defendants in this lawsuit. Because the Eleventh Circuit does not permit fictitious party pleadings, Plaintiffs reserve the right to amend the Complaint to add

additional corporate and/or partnership entities as Triton Entities pursuant to Rule 15 of the Federal Rules of Civil Procedure.

### JURISDICTION AND VENUE

17.

This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §133, because Plaintiffs have brought claims pursuant to three federal statutes:  the Investment Advisors Act of 1940; the Securities Exchange Act of 1934; and the Investment Company act of 1940.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 for the state law claims asserted in the Complaint, because the claims are so related to the federal claims in the action that they form part of the same case or controversy.

18.

Venue is proper in proper in the Northern District of Georgia pursuant to 28 U.S.C. §1391, because all of the Defendants are residents of the state of Georgia and/or have their principal place of business in the state of Georgia and within the Northern District of Georgia.  Furthermore, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Georgia.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS

19.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 18 above, as if contained herein.

20.

Plaintiff Steve Urvan became acquainted with the Defendants in or around 2006.  Defendants represented that they could provide management consulting advice, corporate governance, deal structure and general investment advice to Steve Urvan and his business interests.  They also indicated that they had the skills and experience to help Mr. Urvan raise capital for his business entities.   In connection therewith, Urvan and Defendants entered into a management consulting agreement which provided compensation to Defendants for the advice they were providing.

21.

For a number of years which overlapped their relationship with Mr. Urvan, the Defendants worked closely with the Goizueta Business School at Emory University, and Defendants were co-sponsors of the Goizueta Business School's annual Venture Capital Investment Competition where entrepreneurs with new business ideas would present their business plans and seek capital investments to

fuel the growth of their fledgling companies. Based on information and belief, the Defendants used this annual event to build their "portfolio" of companies with whom Defendants "partnered" and, on information and belief, the relationship between the Defendants and the majority of Defendants' "portfolio" companies originated from contacts with and/or the Goizueta Business School.

22.

Once Defendants identified a new business venture with whom they wished to "partner," Defendants would begin to provide advice to these new businesses regarding corporate governance and regarding various ways to raise money, whether by borrowing money from various sources or issuing various forms of investment securities. Defendants would also assist with identifying investors for these businesses. In short, Defendants were offering the same purported services, including investment advice and broker-dealer services, to all of their "portfolio" companies, and to Mr. Urvan.

23.

The investors; however, that Defendants identified for their portfolio partners were often simply either their other "portfolio" companies or individuals associated with those "portfolio" companies. This is precisely how and why Defendants developed their relationship with Mr. Urvan. While Defendants were

supposed to be providing valuable advice to Urvan regarding Mr. Urvan's business, they were also separately advising and urging Mr. Urvan to invest in their "portfolio" companies which would benefit Defendants, but not advance Mr. Urvan's goals or interests, nor would it be in his best interests.

24.

In connection therewith, Defendants would from time to time send "friends and family" notices to their clients, including Mr. Urvan, regarding the opportunity to invest in a business venture to whom Defendants were providing other services and/or in which Defendants (or the principals and employees of Defendants) had invested themselves.   Defendants would also prepare and share financial projections regarding these investment opportunities and share them with their clients, including Mr. Urvan, as part of the cross-marketing efforts.

25.

In or around the summer of 2006, Defendants recommended to Steve Urvan that he invest in a business called Exchange Boulevard.   Defendants were intimately involved with Exchange Boulevard and, based on information and belief, were providing business advice and consulting services to Exchange Boulevard.  Defendants presented Mr. Urvan with a "Five-year Financial Forecast" for Exchange Boulevard, dated August 16, 2006, and a PowerPoint presentation

selling this business opportunity. The "Five-year Financial Forecast" was a product of one of the Triton Entities, Triton Business Development Services, Inc, n/k/a Triton Value Partners, Inc. It was clearly the Defendants' work product and Defendants' financial forecast. Moreover, an employee of Defendants served as the chief operating officer for Exchange Boulevard which was a standard practice for Defendants and their portfolio companies.

26.

As a direct and proximate result of the advice provided by Defendants and Defendants' recommendation of Exchange Boulevard, in and around October 2006, Steve Urvan invested $100,000 in Exchange Boulevard as part of what was described as a "bridge loan". Based on information and belief either before or at the same time that Mr. Urvan was advised by Defendants to loan money to Exchange Boulevard, Defendants (or the principals and employees of Defendants) also invested $175,000 to this "portfolio" company.

27.

As a result of Exchange Boulevard's inability to pay the bridge loan when it came due, Steve Urvan acquired 220,000 shares of stock in Exchange Boulevard as so-called "penalty" shares. Based on information and belief, the Defendants also

acquired "penalty" shares of stock in Exchange Boulevard, as a result of Exchange Boulevard's inability to pay the bridge loan.

28.

By the Fall of 2008, only a year after Defendants advised Mr. Urvan to invest in Exchange Boulevard in the form of the loan and the later acquired stock, Exchange Boulevard was on the brink of bankruptcy and in disparate need of additional capital. As Exchange Boulevard sought the consent of its creditors to pursue a debt restructuring, Defendants continued to provide investment advice to Mr. Urvan regarding this investment. On information and belief, Exchange Boulevard, however, ceased business operations shortly thereafter.

29.

Despite the clear and obvious conflicts of interest that the Defendants' relationship with Exchange Boulevard presented, Defendants made no effort to disclose these conflicts to its investment advisory client, Steve Urvan, and made no effort to obtain his written consent or otherwise mitigate these conflicts of interest.

30.

In or around February 2007, Defendants recommended to Steve Urvan that he invest in a company called Simtrol, Inc. (hereinafter "Simtrol"). As a direct and proximate result of the advice provided by Defendants and Defendants'

recommendation of Simtrol, Mr. Urvan made a $100,000 investment in this company.  Again, Triton Business Development Services, Inc, n/k/a Triton Value Partners, Inc., had been working closely with Simtrol since September 2006, made a formal proposal in January 2007 to expand this relationship and ultimately entered into an agreement with Simtrol to provide "advisory services."  These advisory services included:

- Financial and Strategic Planning;

- Capital Formation, Structure & Funding Strategies;

- Investor Relations & Communications Best Practices;

- Business Practice, Processes, Procedures and Internal Controls;

- Strategic Analysis of the Simtrol Business and Prospects;

- Human Resources Assessment & Development; and

- Access to Triton's extensive network of relationships and resources.

In addition, two employees of Triton Partners, Craig Reamsnyder and Rick Eaton, became full-time management of Simtrol, in or around February 2007.  Introducing Steve Urvan to Simtrol and recommending that he invest in Simtrol apparently was part of providing "access to Triton's extensive network of relationships" to Simtrol.

31.

After TVP Investments was formed in January 2009, Defendants also recommended and caused TVP Investments to loan money to and invest in Simtrol. In fact, in March 2009, TVP Investments loaned Simtrol $250,000 as part of a Master Convertible Promissory Note.  Moreover, as of December 2009, TVP Investments had acquired at least 66,600 shares of Simtrol stock.

32.

Despite the clear and obvious conflicts of interest that the Defendants' relationship with Simtrol presented, Defendants made no effort to disclose this conflict to its investment advisory clients, Steve Urvan, and TVP Investments, and made no effort to obtain their written consent or otherwise mitigate the conflict of interest.

33.

In or around March 2007, the Defendants also introduced Mr. Urvan to an organization called the Alumni Capital Network, providing Mr. Urvan with a PowerPoint presentation for the Alumni Capital Network Fund I, L.P.  Alumni Capital Network was a group with several similarities to what the Defendants were doing, but on a larger scale.  The Defendants; however, wanted to have greater control over this investment opportunity, so they created the Opportunity Fund in

January 2008, which Defendants would control and encouraged Mr. Urvan to become a limited partner in the Opportunity Fund as opposed to directly becoming a limited partner in the Alumni Capital Network Fund I, L.P.  Mr. Urvan is not aware of any other investor in the Opportunity Fund besides himself.  There was little to no benefit for Mr. Urvan to become a limited partner of a limited partnership.  Instead, however, this structure benefited the Defendants by providing control of this investment to themselves as opposed to Mr. Urvan.

34.

In February 2008, Defendants and Alumni Capital Network announced a "partnership" whereby the two entities would "join forces" and seek equity investments through the Southeast.  The "partnership" was facilitated because the investment came indirectly *via* the Opportunity Fund as opposed to Urvan directly becoming a limited liability partner in Alumni Capital Network Fund I, L.P.

35.

In July 2008, Alumni Capital Network made their first $150,000 capital call on the limited partners for an investment in a business called Personal Communications Devices.

36.

Unbeknownst to Mr. Urvan until November 2019, Alumni Capital Network made a second capital call on the limited partners in or around March 2010, in the amount of $300,000.  Because the investment was made through the Opportunity Fund, the capital call would have been directed to the Opportunity Fund through its general partner, Opportunity Fund Manager, which is one of the Triton Entities. Mr. Urvan was never informed of the second capital call or given the opportunity to satisfy the second capital call.  Defendants for unknown reasons did not honor the second capital call.

37.

Pursuant to the terms of the Alumni Capital Network Fund I, L.P. agreement, the failure to respond to a capital call was an event of default and immediately impaired all prior investments by 50% of the their value.  Thus, the $150,000 investment made in 2008 was reduced to $75,000 without Mr. Urvan's knowledge or consent.

38.

The Alumni Capital Network Fund I, L.P. ultimately wound down its operations in 2015, and returned the invested capital to its limited partners. Thus, Opportunity Fund received from Alumni Capital Network a check for $75,000, plus accrued interest, in or around March or April 2015. The Defendants never informed Mr. Urvan of this development and never returned his capital to him.

39.

Despite the clear and obvious conflicts of interest that the Defendants' creation and utilization of Opportunity Fund presented, Defendants made no effort to disclose these conflicts to its investment advisory client, Steve Urvan, and made no effort to obtain his written consent or otherwise mitigate the conflict of interest.

40.

Also in or around October 2008, Defendants provided investment advice to Steve Urvan regarding an investment he made in a company called iTui Telecom. Urvan owned 30,000 shares of iTui Telecom as of October 24, 2008. iTui Telecom was a 'new" client of Defendants in the Fall of 2008, and Defendants undertook the task of valuing the stock for Mr. Urvan at that time. Based on information and belief, Defendants introduced Mr. Urvan to iTui Telecom and recommended that he make this investment. Indeed, after valuing the stock,

Defendants undertook to retain custody of this stock on behalf of Mr. Urvan pursuant to a single stock certificate under a common name for all of Defendants' clients who had invested in iTui Telecom.

41.

Again, despite the clear and obvious conflicts of interest that the Defendants' relationship with iTui Telecom presented, Defendants made no effort to disclose these conflicts to its investment advisory client, Steve Urvan, and made no effort to obtain his written consent or otherwise mitigate the conflict of interest.

42.

On or about October 29, 2010, TVP Investments and sixteen other investors executed Subscription Agreements and purchased Participating Interests in a certain Master Convertible Promissory Note in the principal amount of Eight Hundred Thirty-seven Thousand and Eight Hundred Eighty-Eight Dollars and Zero Cents ($837,888.00) issued by ARC Holdings, Inc. Over the next eight years the maturity date and certain terms of the Master Convertible Promissory Note were amended and/or restated on several occasions. Ultimately, the Second Amended and Restated Master Convertible Promissory Note in the amount of One Million Two Hundred Twenty Thousand One Hundred Thirty-three Dollars and Five cents ($1,220,133,05) became the controlling and operative legal document.

- 21 -

43.

The original Master Convertible Promissory Note dated October 29, 2010, was amended on or about October 29, 2013, and amended a second time on or about April 29, 2014.   In the Fall of 2014, Amended and Restated Master Convertible Promissory Notes were executed on or about September 1, 2014 (in the amount of $1,091,647.62) and October 24, 2014 (in the amount of $1,220,133,05) respectively.   The operative Amended and Restated Master Convertible Promissory Note was amended again on or about July 15, 2016.  A Second Amended and Restated Master Promissory Note, with an effective date of October 17, 2017, was executed on or about June 18, 2018.  After all of these various amendments and restatements, the operative legal document appears to be the Second Amended and Restated Master Promissory Note with an effective date of October 17, 2017.  Throughout this Complaint, the various iterations of the operative Master Convertible Promissory Note will be referred to collectively as the "ARC Holding Promissory Note" and when a specific version of the Note is referenced, the Complaint will recite the full name of that particular document.

44.

The Subscription Agreement and participation in ARC Holding Promissory Note was made "in connection with and subject to" a certain Master Note Agency

Agreement entered into between ARC Holding, Inc. and Ventures. Pursuant to the terms of Master Note Agency Agreement, Ventures assumed the role of "agent and attorney-in-fact" for each of the investors participating in this promissory note investment.

45.

Defendants' relationship with ARC Holdings and its role under the Master Note Agency Agreement presented yet another disabling conflict of interest between Defendants and their investment advisory clients. Yet, Defendants made no effort to disclose these conflicts to its investment advisory client, TVP Investments, and made no effort to obtain TVP Investments' written consent or otherwise mitigate the conflict of interest.

46.

The ARC Holding Promissory Note further provided that at maturity, ARC Holdings was required to pay Ventures as the agent and attorney in fact for the investors *unless* Ventures requested that ARC Holdings pay the investors directly.

47.

Agents, by definition, have a legal duty to (1) act on behalf of and be subject to the control of the principal, (2) act within the scope of authority or power delegated by the principal, (3) discharge their duties with appropriate care and

diligence, (4) avoid conflict between their personal interests and those of the principal, and (5) promptly hand over to the principal all monies collected on principal's behalf.

48.

Ventures has repeatedly violated these agency duties as it pertains to Plaintiffs. More importantly, the principals of Ventures, Jeffrey Zwitter, Donald Gasgarth, and Paul Freischlag, Jr, have disabling conflicts of interest *vis-à-vis* TVP Investments, which properly should be imputed to Ventures and absolutely precludes Ventures from properly acting as agent and/or attorney-in-fact for TVP Investments.

49.

Triton Value Partners, LLC, as well as Jeffrey Zwitter, Donald Gasgarth, and Paul Freischlag, Jr, *sued* TVP Investments and its principal Steve Urvan on or about December 17, 2017. That lawsuit, styled *Triton Value Partners, LLC, Donald Gasgarth, Paul Frieschlag, Jr., and Jeff Zwitter v. Steve Urvan, TVP Investments, LLC, Gunbroker.com, LLC and IA Tech, LLC*, Civil File Action No. 2017-CV-298994, is currently pending in the Superior Court of Cobb County, Georgia (hereinafter the "Cobb County Litigation").

50.

As a result of the Cobb County Litigation, Triton Value Partners, LLC, Jeff Zwitter, Donald Gasgarth, and Paul Freischlag, Jr., as plaintiffs, are manifestly adverse to TVP Investments.  Because Ventures, as a corporate entity, can only act through its principals, any conflicts of interest which disqualify or impact the principals are properly imputed to the corporate entity.  Thus, because Ventures' principals, Jeff Zwitter, Donald Gasgarth, and Paul Freischlag, Jr., are adverse to TVP Investments, Ventures is adverse to TVP Investments.

51.

Once the disqualifying conflict of interest *vis-à-vis* TVP Investments arose upon the filing of the Cobb County Litigation, Ventures was obligated to resign as the Agent pursuant to the Master Note Agency Agreement.  At a very minimum, Ventures was obligated to take appropriate steps to mitigate the conflict of interest and fully disclose to all of the principals the nature of the conflict of interest and how Ventures intended to address it.  Ventures took no such action.

52.

Not only did Ventures make no effort to mitigate the obvious conflict of interest or even to disclose it, Ventures affirmatively proceeded to act as TVP Investments' "agent and attorney-in-fact" through its principal Donald Gasgarth,

who is directly adverse to TVP Investments.  Donald Gasgarth, a plaintiff in the lawsuit against TVP Investments, executed the Second Amended and Restated Master Convertible Promissory Note as the principal of Ventures on or about June 18, 2018.  Moreover, Gasgarth also executed a ratification of a Subordination Agreement on behalf of Ventures on or about December 7, 2018.

53.

The Master Note Agency Agreement contains no provision which purports to waive any present or future conflicts of interest.  Ventures, as agent and attorney-in-fact, had and has a legal duty to avoid conflicts of interest with the investors including TVP Investments.

54.

In August 2019, Plaintiffs became aware that ARC Holdings was imminently close to a liquidity event which would result in payments to the investors, including Plaintiffs.

55.

Counsel for Plaintiffs sent demand letters to Defendants and to ARC Holdings seeking clarification regarding the liquidity event and when or if a payment would be made.  Through this process, Plaintiffs learned that a liquidity event was indeed imminent and that ARC Holdings intended to make a full

payment to Ventures pursuant to the terms of the Master Promissory Note.  ARC Holdings also confirmed to Plaintiffs that prior interest payments of both cash proceeds and stock had been made to Ventures over the course of several years from 2014 through 2019.  Thus, Defendants remain in possession of cash proceeds and ARC Holding stock that properly belongs to Plaintiff TVP Investments.

56.

Counsel for Plaintiffs demanded that Defendants provide an immediate accounting of the ARC Holdings investment including any payments received from ARC Holdings in the form of cash and stock.  Plaintiffs also demanded that pursuant to the terms of the Master Note, that Ventures exercise its discretionary authority to authorize ARC Holdings to make the final liquidity payment directly to TVP Investments.  Ultimately, Ventures reluctantly authorized ARC Holdings to directly pay the final payment to TVP Investments.  Defendants, however, have failed to provide an accounting for any of the cash or stock that was paid by ARC Holdings as interest prior to the final payment.

57.

Defendants never provided Plaintiffs with any status reports or updates regarding the ARC Holdings' investment from at least 2013 through 2019.  Indeed, if Plaintiffs had not discovered in August 2019, that ARC Holdings was on the

verge of a liquidity event, Defendants would have received the final payment from ARC Holdings, and based on their prior practice of not informing Plaintiffs of the status of the investment, Defendants would have wrongfully withheld the payment that was due and owing to Plaintiffs.

### CAUSES OF ACTION

### COUNT I: VIOLATION OF THE INVESTMENT ADVISOR ACT OF 1940

58.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 57 above, as if contained herein.

59.

The Investment Advisers Act of 1940 defines an "investment adviser" as any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who for compensation and as part of a regular business, issues or promulgates analysis or reports concerning securities.

60.

The Defendants have repeatedly acted as an investment adviser as defined by the Investment Advisers Act of 1940 in their business transactions with the Plaintiffs.

61.

Section 206 of the Investment Advisers Act of 1940 provides that it shall be unlawful for any investment adviser, by use of the mails or any means or instrumentalities of interstate commerce, directly or indirectly:

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as a broker for a person other than such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph (3) shall not apply to any transaction with a customer of

a broker or dealer is such broker or dealer is not acting as an investment adviser in relation to such transaction; or

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative.  The Commission shall, for purposes of this paragraph 4 by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive or manipulative.

62.

Defendants have engaged in acts, practices and have conducted their business in a manner that constitutes a course of business that operates or would operate as a fraud or deceit upon another person in violation of Section 206(2) of the Investment Advisers Act of 1940 as more fully described above in Paragraphs 21 through 57 above.

63.

Defendants have in connection with transactions involving ARC Holding, Inc. and Simtrol violated of Section 206(3) of the Investment Advisers Act of 1940 as more fully described above in Paragraphs 21 through 57 above.

64.

As a direct and proximate result of Defendants' violations of the Investment Advisers Act of 1940, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT II: VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934

65.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 64 above, as if contained herein.

66.

The actions, activities and course of business of Defendants as more fully described in Paragraphs 21 to 57 above, violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 as promulgated by the Securities and Exchange Commission.

67.

As a direct and proximate result of Defendants' repeated and consistent violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, Plaintiffs have suffered damages in connection with the securities transactions undertaken by and with Defendants in an amount to be proven at trial.

## COUNT III:  VIOLATION OF SECTION 15(C)(1) OF THE SECURITIES EXCHANGE ACT OF 1934

68.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 67 above, as if contained herein.

69.

The actions, activities and course of business of Defendants as more fully described in Paragraphs 21 to 57 above, constitute the business activities of a broker-dealer as defined by the Securities Exchange Act of 1934 and the Securities and Exchange Commission.

70.

As a statutory broker-dealer, Defendants are required to comply of the provisions of Section 15 of the Securities Exchange Act of 1934 and obtain and maintain an appropriate broker-dealer registration.

71.

Defendants have repeatedly and consistently violated the provisions of Section 15 of the Securities Exchange Act of 1934.

72.

Based upon Defendants multiple and repeated violations of Section 15(c) of Securities Exchange Act of 1934, Plaintiffs have a right to rescind each and every securities transaction which involved Defendants.

73.

Plaintiffs invoke their right to rescind the investments in Exchange Boulevard, Simtrol and Alumni Capital Network and reserve the right to rescind the investment in iTui Telecom.  Plaintiffs affirm the investment in ARC Holdings, Inc.

## COUNT IV:  VIOLATION OF THE INVESTMENT COMPANY ACT OF 1940

74.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 73 above, as if contained herein.

75.

The Triton Entities operated as an Investment Company as defined and contemplated by the Investment Company Act of 1940 by virtue of creating, marketing and issuing the Opportunity Fund, and on information and belief, by creating, marketing and issuing the Accelerator Fund and the Pledge Fund.

76.

On information and belief, in connection with creating, marketing and issuing the Opportunity Fund, the Accelerator Fund and the Pledge Fund, the Defendants violated multiple provisions of the Investment Company Act of 1940.

77.

Plaintiff Steve Urvan was an investor in the Opportunity Fund.

78.

Based upon Defendants multiple violations of the Investment Company Act, Plaintiff Urvan has a right to rescind his investment in the Opportunity Fund and any other funds issued by Defendants pursuant to Section 47(b) of the Investment Company Act of 1940.

79.

Plaintiff Steve Urvan hereby rescinds the investment in the Opportunity Fund.

80.

To the extent Plaintiff TVP Investments had any investments in funds issued by Defendants and based upon Defendants multiple violations of the Investment Company Act, Plaintiff TVP Investments has a right to rescind its investments in

the funds issued by Defendants pursuant to Section 47(b) of the Investment Company Act of 1940.

## COUNT V: VIOLATION OF THE GEORGIA SECURITIES ACT: SECTION 10-5-51

### 81.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 80 above, as if contained herein.

### 82.

Pursuant to O.C.G.A. § 10-5-51(a), it is unlawful for a person that advises others for compensation, either directly or indirectly, or through publications or writings, as to the value of securities or the advisability of investing in, purchasing or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities:

(1) To employ a device, scheme, or artifice to defraud another person; or

(2) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

### 83.

Pursuant to O.C.G.A. §10-5-34(a), it is unlawful for a federal covered investment adviser to transact business in this state as a federal covered investment

adviser unless the federal covered investment adviser complies with O.C.G.A. §10-5-34(c).

84.

The Triton Entities constitute a federal covered investment adviser as contemplated by O.C.G.A. §10-5-34(a).

85.

The Triton Entities have failed to comply with O.C.G.A. §10-5-34(c).

86.

None of the exemptions contained in O.C.G.A. §10-5-34(b) are applicable to any Defendant in this action.

87.

In addition to failing to comply with the requirements of the Georgia Uniform Securities Act as described above in Paragraphs 82 through 86, Defendants have engaged in acts, practices and have conduct their business in a manner that constitutes a course of business that operates or would operate as a fraud or deceit upon another person in violation of O.C.G.A. § 10-5-51(a) as more fully described above in Paragraphs 21 through 57 above.

88.

As a direct and proximate result of Defendants' violations of the Georgia Uniform Securities Act, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VI:  VIOLATION OF THE GEORGIA SECURITIES ACT:  SECTION 10-5-50

89.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 88 above, as if contained herein.

90.

Pursuant to O.C.G.A. § 10-5-50, it is unlawful for a person, in connection with the offer, sale or purchase of a security, directly or indirectly:

(1) To employ a device, scheme, or artifice to defraud; or

(2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the  light of the circumstances under which it is made, not misleading; or

(3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

91.

Pursuant to O.C.G.A. §10-5-30(a), it is unlawful for a person to transact business in the state of Georgia as a broker-dealer unless the person is registered under the Georgia Uniform Securities Act as a broker-dealer or is exempt from registration as a broker-dealer under subsection (b) or (d) of this Code section.

92.

The Defendants have repeatedly acted as a broker-dealer in their business transactions with the Plaintiffs.

93.

The Defendants have failed to comply with O.C.G.A. §10-5-30(a).

94.

None of the exemptions contained in O.C.G.A. §10-5-30(b) are applicable to any Defendant in this action.

95.

In addition to failing to comply with the requirements of the Georgia Uniform Securities Act as described above in Paragraphs 90 through 94, Defendants have engaged in acts, practices and have conduct their business in a manner that constitutes a course of business that operates or would operate as a

fraud or deceit upon another person in violation of O.C.G.A. § 10-5-50 as more fully described in Paragraphs 21 through 57 above.

96.

As a direct and proximate result of Defendants' violations of the Georgia Uniform Securities Act, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VII: COMMON LAW BREACH OF FIDUCIARY DUTY

97.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 96 above, as if contained herein.

98.

Beginning in 2006, Defendants provided financial and investment advice to Plaintiff Steve Urvan in connection with multiple investment opportunities, and numerous other financial decisions.

99.

Beginning in 2009, Defendants began providing financial advice and investment advice to Plaintiff TVP Investments in connection with multiple investment opportunities.

100.

At all times relevant to this Action from 2006 to the present, Defendants had superior knowledge regarding these investment opportunities *vis-à-vis* the Plaintiffs and this superior knowledge influenced Plaintiffs to place trust and confidence in the Defendants.

101.

As part of the financial and investment advice supposedly being provided by Defendants to each Plaintiff beginning in 2006 and 2009 respectively, Defendants had a legal duty and obligation to monitor, track and advise Plaintiffs of the status of these investments on an ongoing basis up to and including the present.

102.

As part of the financial and investment advice being performed by Defendants to each Plaintiff beginning in 2006 and 2009 respectively, Defendants had a legal duty and obligation to avoid and/or mitigate conflicts of interests and put the interests of the Plaintiffs ahead of their own person interests from the inception of the investment advisory relationship up to and including the present.

103.

Defendants have breached their fiduciary duties owed to Plaintiffs on numerous occasions, including but limited to, the following:

(a) Defendants failed to advise Steve Urvan in March 2010 of the second capital call in the amount of $300,000 by Alumni Capital Network and failed to take the necessary steps for the Opportunity Fund to satisfy the capital call. As a direct and proximate result of the Opportunity Fund's failure to honor the second capital call, the value of the Opportunity Fund's initial investment of $150,000 was immediately reduced in half.

(b) In 2015, Alumni Capital Network ceased operations and returned the residual investment amounts to the limited partners, including the Opportunity Fund. Based on information and belief, the Opportunity Fund received $75,000 from Alumni Capital Network, but failed to inform Steve Urvan of receipt of these funds or otherwise apprise Urvan of the developments relating to Alumni Capital Network and to this day has failed to return to Urvan his invested capital.

(c) From 2013 through 2019, Defendants, specifically through Ventures, received interest payments and in-kind stock payments from ARC Holdings as part of the investment pursuant to the Master Promissory Note. Defendants repeatedly and continuously failed to provide status updates regarding this investment and to this day has failed to return to TVP Investments its portion of the investment.

104.

As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs have suffered damages in an amount to be proven at trial.

105.

As a result of Defendants' willful, malicious, wanton and oppressive conduct, Plaintiffs are also entitled to recover punitive damages.

### COUNT VIII:  COMMON LAW CONVERSION

106.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 105 above, as if contained herein.

107.

Defendants have taken unauthorized possession, control and are improperly exercising a right of ownership over personal property owned by Plaintiffs, including but not limited to, the following:

(a) 30,000 shares of iTui Telecom stock that is the property of Steve Urvan;

(b) $75,000 that was received from Alumni Capital Network in 2015 and is the property of Steve Urvan; and

(c) Shares of ARC Holding, Inc. that are the property of TVP Investments, Inc. and TVP Investments' share of any cash payments received from ARC Holdings pursuant to Master Promissory Note.

108.

Plaintiffs have demanded on numerous occasions that Defendants return all stock, bonds and other securities, which are the property of Plaintiffs, to Plaintiffs and Defendants have repeatedly failed to return Plaintiffs' property.

109.

As a direct and proximate result of Defendants' conversion of Plaintiffs' property, Plaintiffs have injured and are entitled to appropriate relief to be determined by the Court.

110.

As a result of Defendants' willful, malicious, wanton and oppressive conduct, Plaintiffs are also entitled to recover punitive damages.

## COUNT IX: ACCOUNTING

111.

Plaintiffs incorporate by reference and re-allege each allegation contained in Paragraphs 1 through 110 above, as if contained herein.

112.

Due to the length of time of the fiduciary, financial advisory relationship between Plaintiffs and Defendants, the number of transactions and issues, as well as the numerous corporate and partnership entities that constitute the Triton Entities, the accounts are complicated and intricate.

113.

Furthermore, due to the length of time of the fiduciary, financial advisory relationship between Plaintiffs and Defendants, the number of transactions and issues, as well as the numerous corporate and partnership entities that constitute the Triton Entities, an adequate remedy at law may not exist.

114.

Therefore, pursuant to O.C.G.A. § 23-2-70(2), Plaintiffs seeks an equitable accounting from Defendants.

**JURY DEMAND**

115.

Plaintiffs demand a trial by jury for all issues properly so tried.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

(1)     Plaintiffs be awarded their actual and consequential damages, as well as punitive damages, in an amount determined at trial on the merits;

(2)     Rescission of the investment advisory contract and relationship between Plaintiffs and Defendants and a return of Plaintiffs to the pre-relationship status quo;

(3)     Rescission of the securities transactions in Exchange Boulevard, Simtrol, Inc. and Alumni Capital Network that were recommended and facilitated by Defendants when they were in violation of the registration requirements of the Securities Exchange Act of 1934 and the Investment Company Act of 1940 and Defendants be required to make Plaintiffs whole;

(4)     An award of punitive damages;

(5)     Pre-judgment and post-judgment interest;

(6)     Defendants be ordered to make all of the books and records, as well as accounts of the Defendants, open and available for a full accounting of the stocks, bonds and other investments that Plaintiffs may have made through Defendants and regarding which Defendants have refused to provide any detail.

(7)    A full and complete accounting of all cash and stock received from ARC Holdings, Inc. so that Plaintiffs can receive their pro rata share pursuant to the terms of Master Promissory Note;

(8)    The appointment of a Receiver to take custody of all shares of ARC Holding that Defendants currently possess until the Accounting can be completed and the appropriate steps can be undertaken to transfer the ARC Holding shares that are currently titled in the name of TVP Ventures, but properly belong to TVP Investments, to TVP Investments;

(9)    That Plaintiffs recover its reasonable costs and expenses of litigation, including reasonable attorneys' fees; and

(10)    That the Court provide Plaintiffs any and all further relief which it deems just and proper.

Respectfully submitted this 10th day of January, 2020.

Respectfully submitted,

/s/ John H. Goselin II
JOHN H. GOSELIN II
Georgia Bar No. 302917

**LITCHFIELD CAVO LLP**
1300 Parkwood Circle SE, Suite 170
Atlanta, GA 30339-2143
Phone: (770) 628-7111
goselin@litchfieldcavo.com

- 46 -

**CULHANE MEADOWS, PLLC**

JEFFREY PAUL LUTZ
Georgia Bar No. 670646
G. BRIAN RALEY
Georgia Bar No. 592810

3330 Cumberland Boulevard
100 City View Suite 500
Atlanta, Georgia 30338
Phone: (404) 606-1650
jlutz@cm.law
braley@cm.law

*Counsel for Steve Urvan and TVP Investments LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Steve Urvan and TVP Investments, LLC )<br><br>  Plaintiffs, )<br><br>v. )<br><br>TVP Ventures, LLC; Triton Value )<br>Partners Opportunity Fund I, L.P.; Triton )<br>Opportunity Fund Manager, LLC; TVP )<br>Ventures Fund Manager, LLC; TVP )<br>Ventures I, L.P.; Triton Holdings )<br>International, Inc.; Triton Accelerator )<br>Fund, LLC; Triton Opportunity Pledge )<br>Fund; and Triton Business Development )<br>Services, Inc. n/k/a Triton Value )<br>Partners, LLC ) | Case No. _____ |

**LR 7.1(D) CERTIFICATE OF FONT COMPLIANCE**

I hereby certify that the foregoing has been prepared with one of the font and

point selections approved by the Court in Local Rule 5.1(C), Northern District of

Georgia, specifically Times New Roman 14 point.

                                        */s/ John H. Goselin II*_____
                                        JOHN H. GOSELIN II
                                        Georgia Bar No. 302917

- 48 -

**LITCHFIELD CAVO LLP**
1300 Parkwood Circle SE, Suite 170
Atlanta, GA 30339-2143
Phone: (770) 628-7111
goselin@litchfieldcavo.com